**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAREN LOUISE WHITEHILL, | CASE NO. 1:13-cv-02802-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION<br>TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 6, 7, 11, 13 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Karen Louise Whitehill for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff suffered various injuries in a motorcycle accident in 1999. However, she was able to return to work full-time for nine years after her accident. She asserts that she cannot work because she has limitations in her upper extremities, but all four medical opinions in this case, including from her treating source, opined that she was not limited in her upper extremities. She asserts that she cannot work because pain from a prosthetic leg limits her ability to sit, but the only medical evidence of sitting limitation is an opinion from a physician's assistant, who is not an

acceptable medical source. This opinion is contradicted by three opinions from acceptable medical sources. This opinion was also contradicted by Plaintiff's admissions that she can drive for considerable periods of time, did not receive any treatment for her impairments through most of the relevant period, and was treating her impairments only with Ibuprofen at the time of the hearing.   The Court also notes that Plaintiff has failed to develop any of her arguments beyond conclusory claims that the ALJ erred in evaluating her pain and the medical opinions. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On November 13, 2010, Plaintiff filed an application for DIB under Title II of the Act. (Tr. 98-104). On April 27, 2011, the Bureau of Disability Determination denied this application (Tr. 39-44), and Plaintiff filed a request for a hearing on October 28, 2011.  (Tr. 51-52). On July 19, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 19-38).  On August 20, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-18). On October 23, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals Council denied on September 18, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On November 15, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April 22, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On July 18, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 12). On August 15, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). Plaintiff's deadline to file a reply passed on August 29, 2014, so the matter is now ripe for adjudication.

### III.      Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart

P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

### A.    Medical and Work Records

Plaintiff was born on June 20, 1968 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 260). She has a twelfth grade education and past relevant work as an accounting clerk, an order clerk, and an administrative clerk. (Tr. 17-18, 143).

In September of 1999, Plaintiff lost her leg in a motorcycle accident. (Tr.

239). She broke both arms, fractured the right scapula, and had a right radial nerve injury. (Tr. 239). However, she returned to work full-time as an account payable clerk from February 21, 2001 to January 7, 2010. (Tr. 143).

On June 20, 2008, Plaintiff had a follow-up with Dr. Vance Roget, M.D., a rehabilitation specialist. (Tr. 211). Plaintiff had fatigue and increased lumbar lordosis, but her gait was generally "good," she did not have significant abnormal pelvic movements, and she only needed to use a cane for long distances or on uneven ground. (Tr. 211). Her work status was "usual," although she wanted to go back to school. (Tr. 211). She had not been following her home exercise program, so she was to start physical therapy to increase endurance, work on gait stability, strength, agility and balance. (Tr. 212).

On October 13, 2008, Plaintiff followed-up with Dr. Roget. (Tr. 213). She felt "weird numbness" in her fingers. (Tr. 213). She had been taking Buspar "to prevent work stress" but discontinued it when it caused headaches. (Tr. 213). On exam, she had tenderness and pain which "may [have been] due to increased reaching and writing, and probably not stretching enough, along with associated stress reaction." (Tr. 213). She was advised to exercise at home, discuss worksite ergonomics, and to try resuming Buspar "especially for her work stress and associated myofascial pain." (Tr. 213).

On September 21, 2009, Plaintiff followed-up with Dr. Roget. (Tr. 209). She

reported an onset of multiple symptoms eleven days earlier. (Tr. 209). She was reporting pain in her elbow, wrists, and shoulders, tingling in her hand, and abdomen discomfort. (Tr. 209). She reported a "much" higher work load, causing her stress. (Tr. 209). She had tenderness and was tense and anxious. (Tr. 209). He concluded that she was having a "stress reaction" and myofascial pain. (Tr. 210).

Plaintiff stopped working on January 7, 2010. (Tr. 14). On August 3, 2010, Plaintiff had an intake evaluation at Golden Valley Health Center ("GVHC") with physician's assistant Christine Cavanaugh. (Tr. 255). She was there for a blood pressure check and to follow-up from an emergency room visit. (Tr. 255). Plaintiff indicated that she had attempted to refill an Ortho Evra contraception patch, but her blood pressure was too high so she was instructed to go to the emergency room. (Tr. 255). Plaintiff reported it was "simply hard for her to walk across the parking lot when she is in pain." (Tr. 255). Plaintiff reported pain in her "body" for the past eleven years. (Tr. 255). She was in no acute distress and her neurological exam was normal. (Tr. 255-56). She was placed on blood pressure medication and advised to follow-up in one month. (Tr. 256).

On September 19, 2010, Plaintiff presented at GVHC for a sinus infection. (Tr. 251). She never mentioned pain or other symptoms in her upper extremities, back, abdomen, or any negative effects of wearing her prosthesis. (Tr. 251).

On September 25, 2010, Plaintiff followed-up with Ms. Cavanaugh. (Tr.

253). Plaintiff reported experiencing pain "in the following areas: head." (Tr. 253). She never mentioned pain or other symptoms in her upper extremities, back, abdomen, or any negative effects of wearing her prosthesis. (Tr. 253). She was continued on the same dose of blood pressure medication and advised to follow-up in three months. (Tr. 253).

On December 20, 2010, Plaintiff followed-up with Ms. Cavanaugh to address her blood pressure. (Tr. 249). She reported that she had lost nineteen pounds because of "stress" as she was breaking up with her boyfriend of fourteen years. (Tr. 249). She wanted to see a counselor. (Tr. 249). She was "sleeping well, but she [was] worried about finances all the time." (Tr. 249). She never mentioned pain or other symptoms in her upper extremities, back, abdomen, or any negative effects of wearing her prosthesis. (Tr. 249). Later, she indicated that she would not be able to see the counselor due to the cost. (Tr. 250). She was diagnosed with hypertension and anxiety. (Tr. 249).

On February 28, 2011, Plaintiff followed-up with Ms. Cavanaugh for her blood pressure. (Tr. 247). She wanted to be taken off her blood pressure medication, and Ms. Cavanaugh agreed. (Tr. 247). She never mentioned pain or other symptoms in her upper extremities, back, abdomen, or any negative effects of wearing her prosthesis. (Tr. 247).

On March 8, 2011, Plaintiff had a consultative evaluation with Dr. Miguel

Hernandez, M.D. (Tr. 222). Plaintiff reported that she was "presently working." (Tr. 223). She indicated that her impairments only made it "a bit difficult for her to do her work." (Tr. 223). She also reported that uses a wheelchair, which only made it a "little more difficult to get around in her job…she is a clerical worker. She does a lot of computer work." (Tr. 223). On exam,  she was "in no apparent distress." (Tr. 223). She reported problems with her prosthetic leg, but did not bring it with her. (Tr. 224). She was able to "transfer herself directly from the wheelchair to the examination table." (Tr. 224). She had a "difficult time" balancing on one foot without her prosthesis and "finger-to-nose and Romberg" were difficult to perform. (Tr. 224). Plaintiff's right elbow was not tender to palpation and her straight leg raise was negative. (Tr. 225). Plaintiff's sensation was "dampened" in her right upper extremity but her grip strength testing showed that she could handle "about 50 pounds of pressure with the right and 60 pounds of pressure with the left." (Tr. 225).

Dr. Hernandez opined that Plaintiff could sit for six hours out of an eight-hour workday and stand or walk for four hours out of an eight-hour workday. (Tr. 226). He opined that she could occasionally lift up to twenty pounds and frequently lift up to ten pounds. (Tr. 226). He opined that Plaintiff could frequently bend, stoop, kneel, crouch and crawl and had "no manipulative limitations." (Tr. 226).

On April 6, 2011, Dr. L. Kiger, M.D., completed a physical RFC

assessment. (Tr. 228). He noted that, in March of 2010, Plaintiff made a phone call to the agency and stated that "she wanted to make sure that we understood that she does have pain, all day. She does not take pain meds, because she does not believe in them and also she does not have the money to buy them. States she has phantom pain also." (Tr. 233). On exam, she was "very emotional when discussing her conditions." (Tr. 233). He noted that evidence from Plaintiff's prosthetics company indicated that she was doing "very well" and was "very satisfied" with her leg in January and February of 2010, but that she was "very uncomfortable" after a car accident in April of 2010 and began reporting in December of 2010 that her weight loss was causing the prosthetic to not fit correctly. (Tr. 234). He also reviewed Plaintiff's exam from Dr. Hernandez. (Tr. 234). He noted that there was "no medical reason" that Plaintiff could not wear a prosthesis and that a sedentary RFC with postural restrictions is supported. (Tr. 235).

Dr. Kiger opined that she could occasionally lift up to twenty pounds and frequently lift up to ten pounds. (Tr. 229). He opined that she could stand or walk for two hours out of an eight-hour work day and sit for six hours out of an eight-hour workday. (Tr. 229). He opined that she could only occasionally use foot controls in her left lower extremity. (Tr. 229). He opined that she could frequently climb, balance, stoop, and kneel, and occasionally crouch or crawl. (Tr. 230). He opined that Plaintiff had no manipulative limitations. (Tr. 230).

On May 21, 2011, Plaintiff followed up at GVHC. (Tr. 245). She reported she was there "for cough for 1 day and chest pains." (Tr. 245). Notes indicate that Plaintiff "experiences pain in the following area: chest." (Tr. 245). She reported that she was not taking any medications and was not allergic to any medications. (Tr. 245). She never mentioned pain or other symptoms in her upper extremities, back, abdomen, or any negative effects of wearing her prosthesis. (Tr. 246).

On September 1, 2011, Dr. I. Ocrant, M.D., completed an RFC assessment. (Tr. 237). He noted that Plaintiff had stated in her reconsideration application that there had been no changes since the last decision and had not seen any doctors since the last decision. (Tr. 237). He affirmed Dr. Kiger's assessment. (Tr. 237).

On October 7, 2011, Plaintiff followed-up with Ms. Cavanaugh. (Tr. 241-42). Plaintiff stated that she was there for "blood pressure check and right leg pain for one and [one half] month." (Tr. 241). Plaintiff reported that she had stopped taking her blood pressure medication because she had lost twenty pounds and was not having any elevated pressures anymore. (Tr. 241). Plaintiff was reporting pain in her right toe, along with "chronic pain because of her prosthesis on her left leg that causes misalignment of her spine" with "neck, back and shoulder discomfort." (Tr. 241). She did "not want a narcotic, but would like Ibuprofen." (Tr. 241). Plaintiff agreed to laboratory tests for arthritis, but declined an X-ray of her toe "due to cost." (Tr. 242). She was prescribed 800 mg of Ibuprofen. (Tr. 242).

On March 16, 2012, Plaintiff followed-up with Ms. Cavanaugh. (Tr. 240). She was reporting "a lot of joint pain lately in the elbows and shoulders" and was "interested in permanent disability" but had "not used narcotics in some time" and was only using "Ibuprofen for pain." (Tr. 239). Ms. Cavanaugh opined that she was permanently "partially disabled." (Tr. 239). She indicated that she was not allergic to any medications and was not taking "medications active prior to" that day's visit. (Tr. 239). She rated her pain as a seven out of ten. (Tr. 240). Ms. Cavanaugh indicated that Plaintiff would be "sent to occupational health evaluator to perform physical to see what type of limitations she has and whether she constitutes total disability." (Tr. 240).

On March 27, 2012, Plaintiff had the evaluation at Modesto Physical Therapy with Richard R. Cox, P.T. (Tr. 260). Plaintiff reported tingling, numbness, and pain in both upper extremities, and cramps in her left hand. (Tr. 260). She reported that she had been highly motivated to return to work, but "as the years have gone on, she has had fatigue, and notices she has been dropping objects with both hands." (Tr. 260). She was reporting sensation loss and weakness in her upper extremities. (Tr. 260). She reported irritation in her groin from pressure from her prosthetic socket and feels that her stomach was "sinking" deeper into the socket due to her weight loss. (Tr. 260). Plaintiff reported that she had "fallen, but she does not fall often, and she fell because she tripped over her prosthesis." (Tr. 260).

Plaintiff reported "she takes Ibuprofen, which does help to decrease the pain," but indicated she has trouble sleeping. (Tr. 260). On exam, Plaintiff was able to ambulate "with a straight cane independently" for 200 yards, although she reported fatigue after 100 yards. (Tr. 261). Plaintiff had "limited cervical spine range of motion, accompanied by patchy sensation loss in both upper extremities and both hands." (Tr. 261). However, she had "very good overall function." (Tr. 261).

On May 2, 2012, Ms. Cavanaugh completed an RFC assessment. (Tr. 265). The only clinical findings she used to support her opinion were "pain" and "compensating." (Tr. 262). She noted that Plaintiff is treated only with Ibuprofen with no side effects. (Tr. 262). She opined that Plaintiff was psychologically stable, but that pain would interfere with her concentration and attention "frequently." (Tr. 263). She opined that Plaintiff could walk "0" city blocks. (Tr. 263). She opined that Plaintiff could sit for twenty minutes at a time, stand for ten minutes at a time, and could not do either for more than two hours out of an eight-hour workday. (Tr. 263). She opined that Plaintiff could rarely lift ten to twenty pounds and occasionally lift less than ten pounds, but could never lift more than twenty pounds. (Tr. 264). She opined that Plaintiff did not have any "significant limitations with reaching, handling or fingering" and that Plaintiff could use her hands, arms, and fingers "100%" of the day. (Tr. 265).

On July 12, 2012, Plaintiff established care as a new patient with Dr. Karen

Dodge, M.D. (Tr. 268). Plaintiff was reporting pain, tingling, and weakness. (Tr. 267). She was "work[ing] out at home gym," although she had more recent inactivity from arm pain and weight gain. (Tr. 267). She was only taking Motrin for her pain. (Tr. 267). She had no swelling and normal reflexes except for 4/5 wrist flexion/extension and thumb opposition on the left. (Tr. 268). She was given a prescription for a prosthetic leg and scheduled for an EMG. (Tr. 268).

## B.    Function Report, Testimony, and Findings

On November 19, 2010, Plaintiff had a face-to-face interview at the state agency. (Tr. 137). She was observed to have problems sitting, walking, using hands, and writing and was "very emotional when discussing her conditions." (Tr. 139). Plaintiff indicated that she was taking Vicodin for pain. (Tr. 145). In an undated Appeals Report, she indicated that she was having increasing and worsening stiffness, weakness and painful inflammation in her fingers, wrist, elbows, shoulders, neck, hips, knee, ankle, and toes. (Tr. 195). She indicated that she was experiencing left arm weakness and additional difficulty falling and staying asleep due to pain. (Tr. 195). She reported that pain, swelling and insomnia makes her less able to sit, stand, and walk. (Tr. 198). She indicated that she cannot "lift items such as a drinking glass full of water" with her left arm without pain, weakness, and dropping them. (Tr. 199). She reported that she loses feelings in her fingers, which makes it harder to use her wheelchair, use the toilet, and perform

daily responsibilities. (Tr. 199). She reported that she had "tried hard" to avoid pain medications. (Tr. 199).

On July 19, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 19). She testified that she had received unemployment since losing her job in January of 2010 until the last quarter of 2011. (Tr. 25). She testified that she was looking for work during that period, but only work "for the number of hours [she] would physically be able to do it." (Tr. 26). She testified that she could not sit for long periods of time because her prosthetic pushes into her upper abdomen, but admitted she could drive for an hour without stopping. (Tr. 26, 29). She testified that she could dress herself, but if she already had the prosthetic on, she needed help to put a shoe on it. (Tr. 29). She testified she could cook, but has problems carrying things. (Tr. 30). She explained that it can be difficult to hold a bowl of cereal or ice cream. (Tr. 33). She testified that weakness, tightness and swelling cause her to drop things. (Tr. 34). She reported that she only uses her cane for long distances or uneven surfaces, and that she uses the wheelchair whenever she is not wearing the prosthetic. (Tr. 30). She indicated that her upper extremities had gotten worse over time, but she had not been able to get treatment because she had no insurance. (Tr. 32). She indicated that she was planning to get an EMG in August. (Tr. 32).  She became emotional, and stated that she does not "like to admit to weakness." (Tr. 35). She testified that she was in pain all over her body. (Tr. 34).

A vocational expert also appeared and testified. (Tr. 36). He testified that, given the ALJ's RFC assessment as described below, Plaintiff could perform her past relevant work as an accounting or order clerk as typically performed. (Tr. 36). The vocational expert also testified that if Plaintiff could only sit or stand for two hours a day or could only occasionally lift less than ten pounds, but no more, that would preclude all work. (Tr. 37).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 7, 2010, her alleged onset date. (Tr. 13). At step two, the ALJ found that her left above-knee prosthesis was medically determinable and severe. (Tr. 13). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 13). The ALJ found that Plaintiff had the RFC for sedentary work, with an ability to lift "up to" ten pounds regularly, but was never able to climb ladders, ropes, or scaffolds, was only able to occasionally operate foot controls with the left lower extremity, climb ramps, or climb stairs, and frequently balance or stoop. (Tr. 14). At step four, the ALJ found that Plaintiff could perform past relevant work, and was not entitled to disability benefits. (Tr. 17).

## VI.    Plaintiff Allegations of Error

### A.    Vocational testimony

Plaintiff asserts that the "Vocational Expert testimony was not followed in this matter" because the vocational expert testified that if Plaintiff could only lift

*less than* ten pounds occasionally, she would not be able to engage in any work. (Pl. Brief at 5). However, the ALJ found that Plaintiff could lift *up to* ten pounds occasionally. (Tr. 14). This may seem like hair-splitting, but it is a crucial distinction, because sedentary work is defined as lifting "up to" ten pounds occasionally. 20 C.F.R. § 404.1567 ("Sedentary work involves lifting *no more than* 10 pounds") (emphasis added); *Makovics v. Schweiker*, 577 F. Supp. 1287, 1295 (D. Del. 1983) (Sedentary work "require[es] no more than *occasional* lifting of up to ten pounds") (emphasis in original); *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) ("A claimant can do sedentary work if he can…do *occasional* lifting of objects *up to* ten pounds") (emphasis added); *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999) (Ability to "lift 10 pounds occasionally" is consistent with "finding of capacity to perform full-time sedentary work."). *But see Davis v. Shalala*, 883 F. Supp. 828, 837 (E.D.N.Y. 1995) (Ability to lift "*less than* 10 pounds occasionally" is not consistent with ability to perform sedentary work). This distinction is also consistent with the job descriptions of Plaintiff's past relevant work in the Dictionary of Occupational Titles ("DICOT"). 216.482-010 ACCOUNTING CLERK, DICOT 216.482-010 (Position only requires "[e]xerting *up to* 10 pounds of force occasionally") (emphasis added); 249.362-026 ORDER CLERK, DICOT 249.362-026 (Position only requires "[e]xerting *up to* 10 pounds of force occasionally"). Thus, the ALJ was not required to follow the vocational

expert testimony that, if Plaintiff could only lift "less than" ten pounds, she could not work, because the ALJ found that she could lift "up to" ten pounds, which coincides with the VE testimony that she could perform sedentary work as an accounting clerk or an order clerk.

Consequently, this is viewed more appropriately as a challenge to the ALJ's RFC finding that Plaintiff could perform the lifting and carrying requirements of sedentary work, not a challenge to the VE testimony. As the Third Circuit has explained:

> [O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005). However, Plaintiff has not properly challenged the ALJ's determination that she could lift up to ten pounds. Even if she had, the ALJ would have had substantial evidence to conclude that she was not limited in her ability to use her upper extremities. All four of the medical opinions in this case, including Plaintiff's treating source opinion, indicated that she did not have upper extremity limitations. (Tr. 222-26, 228-33,

237, 262-65). As a result, substantial evidence supports the ALJ's determination regarding the functional capacity of her upper extremities.

## B.   The ALJ's credibility assessment

Plaintiff writes that the ALJ failed to use the correct standard in evaluating Plaintiff's pain, but does not develop this argument. Local Rule 83.40.4(b) requires that in social security cases, a Plaintiff's brief "shall set forth . . . the specific errors committed at the administrative level which entitle plaintiff to relief."  M.D. Pa. Local Rule 83.40.1.  Local Rule 83.40.4(b) elaborates that "[a] general argument that the findings of the administrative law judge are not supported by substantial evidence is not sufficient."  *Id.*; *cf. Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008) (explaining that Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a 'showing,' rather than a blanket assertion, of entitlement to relief and, as a threshold requirement, the plain statement of pleadings must possess enough heft to show that the pleader is entitled to relief).   Failure to adequately raise an issue results in its waiver. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.,* 44 F.3d 1194, 1203–04 (3d Cir. 1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue).   Thus, the Court declines any invitation to mine the record to make Plaintiff's case.  *Cf. Crawford v. Washington*, 541 U.S. 36, 68 (2004) (declining to "mine the record" in order to support party's case).

Even if it were not waived, the ALJ would have substantial evidence to conclude that Plaintiff's complaints regarding her pain were not fully credible. Plaintiff asserts that the ALJ erred in assessing her credibility. When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. When the Court reviews the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")).

Here, although there was objective evidence of Plaintiff's underlying impairments, there is no objective evidence of her pain, specifically her inability to sit for more than two hours in an eight-hour day. As a result, the ALJ had to make a credibility assessment of her subjective complaints. The ALJ noted that Plaintiff made inconsistent claims. For instance, the ALJ found that she made inconsistent claims regarding when she was able to work. (Tr. 14). Initially, she indicated that she was rendered unable to work in 1999, but that is contradicted by her report that she was working forty hours a week up until 2010. (Tr. 14). The ALJ also cited Dr. Roget's 2009 notation that Plaintiff was increasing her work load. (Tr. 15). Similarly, the Court notes that Plaintiff was receiving unemployment throughout the relevant period, which required her to certify she was able to work and to look for work. (Tr. 25-26, 117). She also reported that she was actually working in 2011 to Dr. Hernandez, and indicated that her impairments only made it a "little more difficult" or a "bit difficult" to do her work. (Tr. 223). An ALJ is entitled to consider the consistency of Plaintiff's claims in evaluating her credibility. SSR 96-7p.[1]

The ALJ also noted that Plaintiff did not receive treatment for her impairments between January 2010 and October of 2011, although she did receive

---

[1] The Court also notes that, on November 19, 2010 Plaintiff indicated that she was taking Vicodin for pain, but none of the medical records, which span from June of 2008 to May of 2012, indicate she was ever taking Vicodin. (Tr. 145).

treatment for blood pressure, sinusitis, and chest pain. (Tr. 15). An ALJ is entitled to consider Plaintiff's course of treatment in evaluating her credibility.[2] SSR 96-7p. Finally, the ALJ relied on medical opinion evidence that contradicted Plaintiff's claims. (Tr. 16). All three of the state agency opinions indicated that Plaintiff could perform sedentary work. (Tr. 16). Plaintiff's physical therapist opined that she had "very good overall function." (Tr. 16). All four opinions, including her treating source opinion, indicated that she did not have limitations related to her upper extremity. (Tr. 16). As discussed further below, the ALJ appropriately weighed and relied on these decisions. Consequently, substantial evidence supports the ALJ's credibility determination.

### C.    The ALJ's assignment of weight to the medical opinions

Plaintiff argues that the ALJ erred in assigning greater weight to the state agency physicians instead of the treating physicians, but does not develop this argument further. (Pl. Brief at 5). Thus, it is waived. *Kiewit,* 44 F.3d at 1203–04 (3d Cir.1995). Even if it were not waived, the ALJ would have had substantial evidence to conclude that the three consistent opinions sources that Plaintiff could engage in sedentary work were entitled to greater weight than the single opinion from a non-acceptable medical source. An ALJ is entitled to rely on state agency

---

[2] Although Plaintiff claimed that she could not afford treatment, the ALJ emphasized that she did not complain of her impairments during this 22 month period. Thus, the ALJ was entitled to conclude that her lack of treatment was due to a lack of impairment, rather than a lack of resources. SSR 96-7p.

opinions as long as evidence is not rejected for "no reason or the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993).

Opinions by non-acceptable medical sources may never be given controlling weight, so there is no treating opinion entitled to controlling weight in this case. SSR 06-3p ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").  20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. § 404.1527(c)(3) states that the "more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings" and the "better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20

C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

The ALJ wrote that Dr. Hernandez's opinion was given great weight because he is a "Board Certified doctor" who examined Plaintiff and performed a "comprehensive evaluation," as well as reviewing the relevant medical records. (Tr. 17). The ALJ also wrote that Dr. Hernandez's opinion was "supported by objective findings including observations and diagnostic test results." (Tr. 17). This is an accurate characterization of the record. Dr. Hernandez observed that Plaintiff's straight leg raise was negative and that grip testing showed that she could handle fifty to sixty pounds of pressure in each upper extremity. (Tr. 225). Plaintiff also reported that she was "presently working." (Tr. 223). The ALJ also found that Dr. Hernandez's opinion was consistent with the record as a whole. (Tr. 17). This is an accurate characterization of the record, as Dr. Hernandez's opinion was consistent with her physical therapist's conclusion that her overall function was "very good" (Tr. 261), the opinions of Dr. Kiger and Dr. Ocrant (Tr. 229-30, 237), and Plaintiff's lack of treatment through most of 2010 and 2011.

The ALJ wrote that Dr. Kiger and Dr. Ocrant's evaluations were "supported by objective findings." (Tr. 17). This is an accurate characterization of the record, as Dr. Kiger and Dr. Ocrant reviewed Dr. Hernandez's opinion and incorporated his objective findings. (Tr. 233-35, 237). The ALJ also wrote that they were

"consistent with the record as a whole." (Tr. 17). This is an accurate characterization of the record, as these opinions also comport with the physical therapists' observation that she had "very good" overall function, Dr. Hernandez's opinion, and Plaintiff's lack of treatment.

In contrast, several of Ms. Cavanaugh's specific limitations were contradicted by objective medical evidence. The ALJ specifically noted that Ms. Cavanaugh's opinion was "inconsistent" with the record and "not supported by objective findings." (Tr. 16). This is an accurate characterization of the record. Ms. Cavanaugh opined that Plaintiff could walk "0" city blocks, but Mr. Cox observed her walking 200 yards. (Tr. 261, 263). She opined that Plaintiff could never lift more than twenty pounds, but Mr. Cox observed her withstanding pressure of fifty pounds on the right and sixty pounds on the left. (Tr. 261, 264). She opined that Plaintiff could not sit for more than twenty minutes at a time, but Plaintiff testified that she could drive for an hour at a time without stopping. (Tr. 29, 264). Ms. Cavanaugh's opinion was not well-supported; the only clinical findings she indicated were "pain" and "compensating." (Tr. 262). The ALJ further explained that Ms. Cavanaugh had a "limited treating relationship, seeing the claimant only every 4-6 months or 2-3 times per year, with minimal treatment rendered or anticipated." (Tr. 16). She sent Plaintiff to a vocational evaluation instead of evaluating Plaintiff's limitation herself. (Tr. 240). Consequently, the ALJ

appropriately determined that her opinion was entitled to less weight than the state agency physicians pursuant to the Regulations.

### D. Public policy

Plaintiff finally argues that "public policy" should preclude her from being punished for "attempting to return to work." (Pl. Brief at 7). There are already regulations that address Plaintiff's policy concerns:

> We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity. We will use the criteria in paragraph (c) of this section to determine if the work you did was an unsuccessful work attempt.

20 C.F.R. § 404.1574(a)(1). However, the Commissioner "will not consider work you performed at the substantial gainful activity earnings level for more than 6 months to be an unsuccessful work attempt regardless of why it ended or was reduced below the substantial gainful activity earnings level." 20 C.F.R. § 404.1574(c)(5). Here, Plaintiff successfully returned to work for nine years. She earned more than $20,000.00 per year each year from 2002 to 2009. (Tr. 113). The Court also notes that an amputation is only an automatic basis for disability benefits if it is an amputation of both hands, or if it is an amputation coupled with additional limitations. Charles T. Hall, *Social Security Disability Practice* § 7:6.Amputations ("Claimants below the age of 50 (except for those between 45 and 50 who are illiterate) whose only limitation is the amputation of one arm or one leg

have little chance of winning unless there is some unusual circumstance…"). Regardless, the Court is not entitled to determine whether Plaintiff should be entitled to disability benefits pursuant to public policy; that is an issue for the legislature. *Simmons v. U.S.*, 120 F. Supp. 641, 648 (M.D. Pa. 1954) (citing *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 340, 17 S.Ct. 540, 559, 41 L.Ed. 1007). As a result, the Court recommends that Plaintiff's appeal be denied, as Plaintiff has failed to raise any allegation of error that warrants remand.

### E.      Records submitted after the ALJ decision

Plaintiff submitted an EMG from August of 2012 to the Appeals Council that was not before the ALJ. (Tr. 269). However, when the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material," but only if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. *Id.* In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.* The relevant time period is "the period on or before the date of the [ALJ's] hearing

decision." 20 C.F.R. § 404.970(b); *Mathews v. Apfel*, 239 F.3d at 592. The materiality standard also "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak*, 745 F.2d at 833.

Here, Plaintiff has not asserted any cause, much less good cause, for failing to present the EMG to the ALJ, as the EMG existed at the time of the ALJ's decision. Moreover, there is no reasonably possibility it would have changed the ALJ's decision. The report states that Plaintiff "has full strength in the upper extremities with the exception of mild grasp weakness on the right. Reflexes are 1+ in the upper extremities. Sensation is diminished in the ridge radial nerve distribution but otherwise intact to pinprick in the upper extremities." (Tr. 269). It also indicated that, although Plaintiff's right radial sensory response was "mildly prolonged," her bilateral ulnar motor responses, bilateral median motor responses, bilateral median sensory responses, bilateral ulnar sensory responses, bilateral median palmar sensory responses, and bilateral ulnar palmar sensory responses are all "normal." (Tr. 269). In other words, the only abnormalities identified were described as "mild." (Tr. 269). Dr. Hernandez had observed similar sensory deficits in her right upper extremity and still concluded that she could perform sedentary work. (Tr. 225). Although Plaintiff's condition may have been worsening, the ALJ had substantial evidence to conclude that her impairments had

not worsened to the point that she was unable to perform her past relevant work as of the decision date. If Plaintiff's condition continued to deteriorate after that date, the appropriate remedy is to file a new application for benefits, not to award benefits under the present application. *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Plaintiff's EMG, like the medical evidence submitted to the ALJ, does not establish limitations that would preclude her from sedentary work. Consequently, the Court did not consider the EMG and does not recommend remand pursuant to Sentence Six.

## VII.      Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting

Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 28, 2015                    _____
                                            s/Gerald B. Cohn
                                            GERALD B. COHN
                                            UNITED STATES MAGISTRATE JUDGE